RECEIVED

JAN 2 9 2009

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| PETER C. SCHEXNAYDRE | CIVIL ACTION NO. 06-0987 |
| VERSUS | JUDGE DOHERTY |
| ARIES MARINE CORP. | MAGISTRATE JUDGE HILL |

## RULING

The instant lawsuit arises out of the termination of plaintiff, an employee of Aries Marine Corporation ("Aries Marine"), allegedly in violation of the Family and Medical Leave Act ("FMLA").[1] This matter has been submitted to the Court for consideration on briefs. Additionally, the matter has been bifurcated at the request of the parties, that is, the issue of liability/applicability of the FMLA will be tried first, and, should the FMLA be found to apply, the issue of damages will then be tried.

Aries Marine argues the plaintiff was assigned to the M/V Calvin Bayne on the date he requested leave, and that the M/V Calvin Bayne was assigned to the Port of Cameron, Louisiana on that date. Aries Marine contends the Port of Cameron is plaintiff's "worksite" and that, because Aries Marine employs less than 50 people within 75 miles of the Port of Cameron, the plaintiff is not an eligible employee under the FMLA. As the FMLA provides this Court's only jurisdictional basis for the lawsuit, Aries Marine argues plaintiff's claims should be dismissed.

---

[1] Plaintiff contends he requested leave and did not appear for his crew change on June 23, 2005 in order to care for his wife, who was suffering from seizures and was under a doctor's orders not to be alone.

Although the plaintiff does not identify exactly *which* provisions of the FMLA the defendant is alleged to have violated under the FMLA in his complaint, this Court notes the FMLA begins at 29 U.S.C. §2601.

Plaintiff acknowledges he was scheduled for a crew change on the M/V Calvin Bayne on June 23, 2005 – the date after he requested leave – but argues his worksite was Aries Marine's corporate office in Youngsville, Louisiana, because that is the place from which his work was assigned. Plaintiff argues ports changed as the needs of defendant's customers changed, but the Youngsville office was always the office that assigned plaintiff's work.

The issue is critical, because the location of plaintiff's worksite determines whether he is an eligible employee under the FMLA. As noted below, the parties have stipulated fewer than fifty employees worked within a seventy-file mile radius of the Port of Cameron, but more than fifty employees worked within a seventy-five mile radius of the Youngsville office. Thus, if this Court determines the plaintiff's worksite is the Port of Cameron, this Court must find plaintiff is not an eligible employee under the FMLA. If the Court so finds, this Court will not have subject matter jurisdiction over this case, and the case must be dismissed.

I. **Facts**

The parties have stipulated to the following facts:

1. The Plaintiff was hired on December 6, 1999 as an able-bodied seaman and assigned to the M/V Ram Charger, working 28 and 14;

2. On August 27, 2001, after receiving his mate's license, the Plaintiff was promoted to mate and assigned to the M/V Challenger working 28 and 14;

3. On February 20, 2002, after requesting to transfer to a boat with a 14 and 14 crew schedule, the Plaintiff was transferred to the M/V Allison where he remained as mate through May 2005;

4. On June 23, 2005 Plaintiff was scheduled for crew change on the M/V Calvin Bayne, an Aries Marine supply boat which had been under charter and working out of the port of Cameron, Louisiana for several months;

5. Aries Marine crew member's boat assignments are generally permanent. A

crew member's boat assignment may be changed only if the crew member is promoted, he exhibits poor work performance, he becomes unable to get along with the rest of the crew, or he requests reassignment;

6. In excess of fifty employees worked within a seventy-five mile radius of the Aries Marine Corporation office located in Youngsville, Louisiana;

7. Less than fifty employees worked within a seventy-five mile radius of the Port of Cameron, Louisiana;

8. All mates, including Peter Schexnaydre, employed by Aries Marine were required to call the Youngsville, Louisiana office prior to the beginning of their 14 day workshift in order to learn the location of their assigned vessel;

9. In June 2005, Plaintiff worked 14 and 14 for Aries Marine as a supply boat mate.

10. In June 2005, Aries Marine owned and operated nine offshore supply boats under time charter to oil and gas industry customers to supply offshore platforms located in the Gulf of Mexico. Each time charter was for an unspecified period of time and would last anywhere from a few days to more than a year, depending on the needs of the customer;

11. While under charter, each Aries Marine supply boat operated out of the port nearest to the customer's offshore platform. Each boat was re-supplied, re-fueled, and loaded with supplies for the platform at the port and under the customer's direction;

12. Aries Marine supply boat crew members began and ended each hitch at the port out of which the supply boat to which they were assigned operated;

13. Each supply boat's day-to-day duties and assignments were directed by a dispatcher located in an office at the port;

14. Each boat crew member received his day-to-day assignments from his next in command on the boat. The next in command also supervised and evaluated that crew member's work; and

15. As mate, Plaintiff was under the captain's direct supervision.

## II. Applicable Law

The FMLA entitles eligible employees of covered employers to take up to twelve weeks of

unpaid, job-protected leave each year due to, *inter alia*, the birth or adoption of a child, to care for a family member, or because of a serious health condition. 29 U.S.C. §2612(a)(1). The term "eligible employee" does not include:

> any employee of any employer who is employed at a worksite at which the employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50.

29 U.S.C. §2611(2)(B)(ii).[2] The foregoing provision is called the "50-75" rule.

Pursuant to the provisions of the FMLA, the Department of Labor has prescribed such regulations as are necessary to carry out the FMLA. 29 U.S.C. §2654. Pursuant to the regulations, where a worker has no fixed worksite, the regulations define the worksite as the site assigned as the worker's home base, the site from which his or her work is assigned, or the site to which he or she reports. *See* 29 C.F.R. §825.111(a)(2). The CFR goes on to discuss the concept of "worksite" as follows:

> (2) For employees with no fixed worksite, e.g., construction workers, transportation workers (e.g., truck drivers, seamen, pilots), salespersons, etc., the "worksite" is the site to which they are assigned as their home base, from which their work is assigned, or to which they report. For example, if a construction company headquartered in New Jersey opened a construction site in Ohio, and set up a mobile trailer on the construction site as the company's on-site office, the construction site in Ohio would be the worksite for any employees hired locally who report to the mobile trailer/company office daily for work assignments, etc. If that construction company also sent personnel such as job superintendents, foremen, engineers, an office

---

[2] 29 U.S.C. 2611(2)(B)(ii) states the following:

(B) Exclusions
The term "eligible employee" does not include-
    (ii) any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50.

*See also Bellum v. PCE Constructors*, 407 F.3d 734, 739-740 (5th Cir. 2005)(holding that the 75 miles is measured in surface miles, not as the crow flies.).

manager, etc., from New Jersey to the job site in Ohio, those workers sent from New Jersey continue to have the headquarters in New Jersey as their "worksite." The workers who have New Jersey as their worksite would not be counted in determining eligibility of employees whose home base is the Ohio worksite, but would be counted in determining eligibility of employees whose home base is New Jersey. *For transportation employees, their worksite is the terminal to which they are assigned, report for work, depart, and return after completion of a work assignment. For example, an airline pilot may work for an airline with headquarters in New York, but the pilot regularly reports for duty and originates or begins flights from the company's facilities located in an airport in Chicago and returns to Chicago at the completion of one or more flights to go off duty. The pilot's worksite is the facility in Chicago.* An employee's personal residence is not a worksite in the case of employees such as salespersons who travel a sales territory and who generally leave to work and return from work to their personal residence, or employees who work at home, as under the new concept of flexiplace. Rather, their worksite is the office to which the report and from which assignments are made.

*Id.* (emphasis added).

Both parties acknowledge there are no published opinions in the Fifth Circuit discussing the definition of "worksite" under the FMLA as applied to a worker with no fixed worksite.[3] In the Senate Report issued in connection with the passage of the FMLA, the Senate wrote:

The term "worksite" is intended to be construed in the same manner as the term "single site of employment" under the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. 2101(a)(3)(B), and regulations under that Act (20 CFR Part 639). *Where employees have no fixed worksite, as is the case for many construction workers, transportation workers, and salespersons, such employees' "worksite" should be construed to mean the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report.*

Sen. Rep. No. 103-3, at 23 (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 25 (emphasis added).

Considering the foregoing, in this matter, plaintiff's "worksite" will be either his home base, the place from which his work was assigned, or the place to which he reported. In the absence of

---

[3] In an unpublished decision, *Hill v. Research Institute of America Group*, 209 F.3d 719 (5th Cir. 2000), the court held a salesperson's worksite was Dallas because that was the residence of her supervisor from whom she received her assignments, to whom she reported her sales, and who monitored her sales and probationary employment periods.

5

Fifth Circuit caselaw addressing the issue, this Court will review the decisions of other circuits interpreting the WARN Act for guidance in determining the plaintiff's worksite in this matter.

### 1. Home Base

"An employee's home base is the place from which he leaves at the start of the work period and/or returns to at the end of the work period, or at the very least, where he is physically present at some point during a typical work period." *Bader v. Northern Line Layers, Inc.*, 503 F.3d 813, 819-20 (9th Cir. 2007) (interpreting the WARN Act), *citing Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 146 (3rd Cir.1998) (in case interpreting WARN Act, court held home base refers not to the physical base of the employer's operations, but rather to the physical base of the employee; "a traveling employee's 'home base' must at a minimum be a location at which the employee is physically present at some point during a typical business trip."); *Teamsters Local Union 413 v. Driver's, Inc.*, 101 F.3d 1107, 1110 (6th Cir.1996) (in case interpreting WARN Act, court held each truck base terminal provided the plaintiffs' home base because it was the physical location where "each trucker starts and ends his or her workweek.").

### 2. Place Where Assignments are Made

The courts interpreting this factor have focused on the place from which day-to-day instructions and assignments are given to employees and the location of day-to-day management of workers. *See, e.g., Bader*, 503 F.3d at 820-21 (worksite was remote construction location – rather than corporate headquarters – where day to day instructions and management occurred on-site). *See also Driver's, Inc.*, 101 F.3d at 1111 (holding that trucking terminals constituted various sites of employment because day-to-day operations were run out of these terminals, even though route assignments were made from a centralized location elsewhere).

6

### 3. Place to Which Employee Reports

"The site to which an employee at a remote location reports is the site at which management issues work orders, and directly reviews a remote employee's job performance and work product in order to evaluate progress and set goals." *Bader*, 503 F.3d at 821, *citing Ciarlante*, 143 F.3d at 148 (the place to which traveling salespeople reported was "the location of the personnel who were primarily responsible for reviewing sales reports and other information sent by the sales representatives, in order to record sales, assess employee performance, develop new sales strategies, and the like"). In *Bader*, the court held that "reporting" to corporate headquarters for the purposes of payroll and other centralized administrative functions is insufficient, standing alone, to qualify corporate headquarters as the single site of employment. *See also Driver's, Inc.*, 101 F.3d at 1110-11 (fact that corporate headquarters had some "operational" control is not dispositive; centralized payroll and certain other centralized managerial or personnel functions are not enough to deem the location a "single site" for purposes of worksite).

## III. Analysis

After review of the briefs of the parties, the relevant facts, and the applicable law, this Court concludes the plaintiff's worksite is the Port of Cameron, Louisiana. First, this Court notes the plaintiff had been given a work assignment, a vessel; the plaintiff worked aboard the vessel to which he was assigned, and the parties have stipulated the Aries Marine crew members' boat assignments were generally permanent and an assignment was only changed if the crew member was promoted, exhibited poor work performance, was unable to get along with the rest of the crew, or requested reassignment. In this case, prior to being assigned to the M/V Calvin Bayne, the plaintiff had been assigned to the M/V Allison from February 20, 2002 through May 2005, a period of more than three

years. In its trial brief, Aries Marine alleges plaintiff was assigned to the M/V Calvin Bayne because of alleged poor work performance and inability to get along with the crew of the M/V Allison, and the plaintiff does not dispute these facts. Therefore, plaintiff's work record reflects crew members were generally semi-permanently attached to a vessel rather than loosely assigned to various vessels in the fleet at any given time.[4]

The parties have also stipulated the M/V Calvin Bayne had been assigned to the Port of Cameron "for several months" on June 23, 2005, the date plaintiff was scheduled for a crew change aboard the vessel. Additionally, the parties stipulated each time charter lasted for an unspecified period of time, from a few days to more than a year, depending on the customer's needs. Thus, at the time in question, the M/V Calvin Bayne was operating out of the Port of Cameron, Louisiana for some time and was operating out of that port site for re-supplying, re-fueling, and crew changes for the duration of that time charter.

The parties further stipulated that while under charter, each Aries Marine supply boat operated out of the port nearest to the customer's offshore platform. Each boat was re-supplied, re-fueled, and loaded with supplies for the platform at the port and under the customer's direction. Furthermore, boat crew members began and ended each hitch at the port out of which the supply boat to which they were assigned operated, and each supply boat's day-to-day duties and assignments were directed by a dispatcher located in an office at the port. Each boat crew member received his day-to-day assignments from his next in command on the boat, who also supervised and evaluated

---

[4] This Court could envision a circumstance where a mate might service a fleet rather than a single vessel and be randomly and temporarily sent to several different vessels among the whole fleet to "fill in" where and as needed and thus might not be considered to be permanently or semi-permanently attached to any single vessel. Under these circumstances, the result reached today could, potentially, be different.

that crew member's work each day. As mate, the plaintiff was under the captain's direct supervision. A crew member was not considered to have made crew change until he reported for duty aboard the vessel at the port site.

In the instant case, the Port of Cameron was the port site to which the plaintiff would have reported at the beginning of his hitch; he would have returned to that port at the end of his hitch, and he was considered *not* have made crew change when he failed to report to that port site. Significantly, however, the plaintiff *did* contact the Youunsgille office the day before his crew change, however, contacting the Youngsville office did *not* satisfy crew change. Therefore, the Port of Cameron was plaintiff's home base while working aboard this vessel.

Additionally, this Court concludes the Port of Cameron was the place where plaintiff's assignments were made. Although plaintiff argues crew members were required to contact the Youngsville office the night before a hitch to "receive [their assignments]," actually, the purpose of contacting the Youngsville office was to "learn the *location* of their assigned vessel," as the parties stipulated in their Stipulations. Once on the vessel at the port site, crew members received their *actual day-to-day assignments* from their next-in-command. Therefore, the crew members did not receive their *assignments* from Youngsville. Rather, they learned the *location* of their vessel from Youngsville. Once on the vessel, the crew members received their day-to-day assignments, as well as day-to-day management and supervision by their superiors. Therefore, the place where the plaintiff's assignments were made – for purposes of this case – was the Port of Cameron.

Finally, the third factor – the place to which the employee reports – this Court finds also to be the Port of Cameron. Here, Aries Marine crew members received their work orders from the port dispatcher and directly from their next-in-command on the boat. Each crew member was supervised

9

on the vessel, and each crew member's job performance was reviewed and evaluated by the boat captain. Therefore, the site to which the plaintiff reported – for purposes of this case – was the Port of Cameron, not the Youngsville office.

The record shows two functions of the Youngsville office that are relevant to our present inquiry: (1) crew members were required to contact the Youngsville office the night before a crew change to learn the location of their assigned vessel; and (2) a crew member could be transported from the Youngsville office to his port site if he lived further from his port site than Youngsville. Neither function *requires physical presence in or contact with* Youngsville, a factor the courts have focused on in determining at least the *home base* of an employee. *See, e.g., Ciarlante,* 143 F.3d at 146 ("a traveling employee's 'home base' must at a minimum be a location at which the employee is physically present at some point during a typical business trip"). Furthermore, based on this Court's understanding of the cases interpreting the WARN Act, that Youngsville might have some "operational" or other centralized managerial or personnel control over the outlying ports is not sufficient to designate Youngsville as plaintiff's worksite in this case.

For the foregoing reasons, this Court concludes the evidence weighs in favor of a finding that the Port of Cameron, Louisiana is the plaintiff's worksite in this case.

### Burden of Proof

Finally, this Court notes defendant filed a well-reasoned and well-supported brief, setting forth caselaw interpreting the "worksite" factors as those factors are interpreted by courts in other circuits interpreting the WARN Act and evidence to support its argument. Aries Marine evaluated each of the worksite "factors" and presented evidence and set forth a cogent argument for why each factor militates in favor of this Court's finding that the Port of Cameron is the plaintiff's worksite.

On the other hand, plaintiff's trial brief consists of less than one full page of actual legal analysis and little evidence, if any, beyond that already addressed. Specifically, the entirety of plaintiff's argument is that because Aries Marine crew members were required to contact the Youngsville office the night before a hitch to determine the location of their assigned vessel, such fact should render the Youngsville office the plaintiff's worksite.

This Court notes this matter has been submitted to the Court on the merits and by way of briefs. Plaintiff has the burden of proving his status as an eligible employee under the FMLA; based on the trial brief filed by the plaintiff, this Court concludes plaintiff has failed to carry that burden.

## IV. Conclusion

For the foregoing reasons, this Court concludes the evidence shows the plaintiff's worksite for purposes of the Family and Medical Leave Act is the Port of Cameron, Louisiana. The Court further concludes the plaintiff has failed to carry his burden of showing he is an eligible employee under the Family and Medical leave Act. As such, the plaintiff is not an eligible employee under the FMLA. Therefore, this Court lacks subject matter jurisdiction over this case, and plaintiff's claims against Aries Marine are DISMISSED WITH PREJUDICE.

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this 29 day of January, 2009.

REBECCA F. DOHERTY
UNITED STATES DISTRICT COURT

11